**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**

| | |
|---|---|
| MCKENNA ROGERS, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>DISA GLOBAL SOLUTIONS, INC.,<br><br>Defendant. | Case No.: 4:25-cv-1010<br><br>**CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL** |

Plaintiff McKenna Rogers ("Plaintiff"), by and through her undersigned counsel, files this Class Action Complaint individually and on behalf of a class of all similarly situated persons against Defendant DISA Global Solutions, Inc. ("DISA" or "Defendant"). Plaintiff bases the following allegations upon information and belief, investigation of counsel, and their own personal knowledge.

## I. NATURE OF THE ACTION

1. Plaintiff brings this action against DISA for its failure to properly secure and safeguard highly valuable, protected, personally identifiable information including, *inter alia*, names, social security numbers, driver's license numbers, other government ID numbers, financial account information, and other data elements (collectively, "PII"); and for its failure to comply with industry standards to protect information systems that contain PII.[1]

2. DISA is a third-party administrator ("TPA") that allows employers to make informed staffing decisions by utilizing DISA's "comprehensive scope of services, including drug

[1] *Notice of Data Incident*, DISA, https://disa.com/notice (last visited March 5, 2025).

and alcohol testing, background check, occupational health, transportation compliance, and financial due diligence."[2]

3. As a TPA, DISA gathers and stores PII of its customers' former, current, or prospective employees. Potential Class Members' PII is collected during that individual's employee screening that they undertake with their former, current, or prospective employer.[3]

4. As a TPA, DISA therefore knowingly collects and stores sensitive PII of its customers' former, current, or prospective employees, and has a resulting duty to secure such information from unauthorized access and exfiltration.

5. DISA expressly recognizes these duties, representing that "[p]rotecting your privacy is important to DISA Global Solutions, Inc."[4] Further, DISA states, "[w]e will not share any of this information with any third party without your express written consent and will take reasonable steps to protect the information you share with us from unauthorized access or disclosure."[5]

6. Despite its duties to safeguard individuals' PII, on April 22, 2024, DISA discovered that it was the victim of a cyber incident where an unauthorized third party accessed a portion of its network between February 9, 2024, and April 22, 2024 and procured certain PII (the "Data Breach" or "Breach").[6]

7. As a direct and proximate result of DISA's negligent failure to implement and follow basic security procedures, Plaintiff's and Class Members' PII—names, social security

---

[2] *The DISA Difference*, DISA, https://disa.com/disa-difference (last visited March 5, 2025).
[3] *Notice of Data Breach*, Office of Vermont Attorney General, https://ago.vermont.gov/sites/ago/files/documents/2025-02-24%20DISA%20Global%20Solutions%20Data%20Breach%20Notice%20to%20Consumers.pdf (last visited March 5, 2025).
[4] *Privacy Policy*, DISA, https://disa.com/privacy-policy (last visited March 5, 2025).
[5] *Id.*
[6] *Notice of Data Incident, supra* n. 1.

numbers, driver's license numbers, other government ID numbers, financial account information, and other data elements—is now in the hands of cybercriminals.

8. Plaintiff and Class Members are now at a significantly increased and certainly impending risk of fraud, identity theft, and other harms caused by the unauthorized disclosure of their PII—risks which may last for the rest of their lives. Consequently, Plaintiff and Class Members must devote substantially more time, money, and energy to protect themselves, to the extent possible, from these crimes.

9. Plaintiff, on behalf of herself and the Class as defined herein, brings claims for negligence, negligence *per se*, unjust enrichment, and declaratory judgment, seeking damages and injunctive relief, including the adoption of reasonably sufficient data security practices to safeguard the PII in Defendant's possession in order to prevent incidents like the Data Breach from reoccurring in the future.

## II. PARTIES

10. Plaintiff McKenna Rogers is an adult and who, at all relevant times, is and was a citizen of the State of New Hampshire. Plaintiff's PII was given to DISA as part of a background check. Plaintiff received a Notice of Data Incident letter, dated February 21, 2025, from Defendant stating that her PII might have been impacted by the Data Breach.

11. Defendant DISA Global Solutions, Inc. is a Delaware corporation with a principal place of business located at 11740 Katy Freeway, Suite 900, Houston, TX 77079.[7]

[7] When subject matter jurisdiction is established under the Class Action Fairness Act, "an LLC's citizenship is based on its principal place of business and laws of incorporation." *Hernandez v. Pure Health Rsch. LLC*, No. 23-cv-00971, 2023 U.S. Dist. LEXIS 191909, at *7 (S.D. Cal. Oct. 25, 2023) (applying § 1332(d)(10) of CAFA) (citing *Jack v. Ring LLC*, 553 F. Supp. 3d 711, 715 (N.D. Cal. 2021)); *see also Abrego v. Dow Chem. Co.*, 443 F.3d 676, 684 (9th Cir. 2006) (noting that § 1332(d)(10) of CAFA provides a different rule for unincorporated associations).

## III. JURISDICTION AND VENUE

12. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d), the Class Action Fairness Act, because Plaintiff and at least one member of the Class, as defined below, are citizens of a different state than Defendant, there are more than 100 members of the Class, and the aggregate amount in controversy exceeds $5,000,000 exclusive of interests and costs.

13. This Court has general personal jurisdiction over Defendant because DISA is a citizen of the State of Texas.

14. This Court is the proper venue for this action pursuant to 28 U.S.C. § 1391(b)(1), because Defendant resides in this District, a substantial part of the events and omissions giving rise to Plaintiff's claims occurred in this District, and Defendant conducts substantial business within this District.

## IV. FACTUAL BACKGROUND

### A. DISA Provides Third-Party Administrative Services and Collects Highly Sensitive Data.

15. DISA is a third-party administrator of employment screening services, including drug and alcohol testing and background checks.[8]

16. DISA is an industry-leading expert that provides service solutions that "are designed for employers that need help navigating increasingly complex employee screening laws or safety-sensitive requirements."[9]

[8] *Notice of Data Incident*, *supra* n. 1.
[9] *The DISA Difference, supra* n. 2.

17. DISA is one of the largest TPAs with more than 55,000 customers. Each year, DISA performs millions of drug tests and background screens.[10]

18. In addition to employee screening services, DISA employs a Transportation Compliance team that processes "millions of files, including driver qualification files, permits, renewals, fuel tax filings, HOS log audits, and more every year."[11]

19. DISA's "financial due diligence team supports some of the largest financial lenders in the industry by ensuring they're loaning to trusted individuals."[12]

20. As part of providing its TPA services, DISA is entrusted with its customers' current, former, and prospective employees' PII. This sensitive PII includes but is not limited to, *inter alia*, names, social security numbers, driver's license numbers, other government ID numbers, financial account information, and other data elements.

21. When entrusting DISA with their PII, Plaintiff and Class Members reasonably expect Defendant would use the utmost care to keep this information confidential and securely maintained, to use this information for business purposes only, and to make only authorized disclosures of this information.

22. Plaintiff and Class Members had a reasonable expectation, based in part on DISA's own statements, that their PII would be protected. DISA represents that "[p]rotecting your privacy is important to DISA Global Solutions, Inc."[13]

---

[10] *Id.*
[11] *Id.*
[12] *Id.*
[13] *Privacy Policy*, *supra* n. 4.

23. However, despite Defendant's stated commitment to data security, DISA failed to adopt reasonable measures to prevent the unauthorized access to Plaintiff's and Class Members' PII by unauthorized bad actors.

**B. The Data Breach.**

24. On April 22, 2024, DISA became aware that it became victim of a cyber incident that impacted portions of its network.[14]

25. An investigation by DISA determined that an unauthorized third party accessed a limited area of its network from February 9, 2024 and April 22, 2024 and stole certain PII.[15]

26. After its investigation, DISA confirmed that the Data Breach impacted 3,332,750 people.[16]

27. The impacted information of DISA's customers' former, current, and prospective employees includes names, social security numbers, driver's license numbers, other government ID numbers, financial account information, and other data elements.[17]

28. It is not known what specific information is contained within the other data elements, but, due to the type of services DISA offers, it could potentially include contact details, employment and education history, criminal and background checks, drug and alcohol testing data, medical and health-related data, educational background, and credit history.[18]

---

[14] *Notice of Data Incident*, *supra* n. 1.
[15] *Id.*
[16] Bill Toulas, *US drug testing firm DISA says data breach impacts 3.3 million people*, BleepingComputer (Feb. 25, 2025), https://www.bleepingcomputer.com/news/security/us-drug-testing-firm-disa-says-data-breach-impacts-33-million-people/.
[17] *Notice of Data Incident*, *supra* n. 1.
[18] Toulas, *supra* n. 16. *See also* Carly Page, *US employee screening giant DISA says hackers accessed data of more than 3M people*, TechCrunch (Feb. 25, 2025), https://techcrunch.com/2025/02/25/us-employee-screening-giant-disa-says-hackers-accessed-data-of-more-than-3m-people/.

29. While DISA has not shared what type of cyber-attack occurred, a now-deleted notice indicated that DISA paid a ransom demand to prevent the stolen data from being publicly released.[19]

30. But even if Defendant took steps to ensure the data's deletion, *i.e.*, paid the threat actors a likely ransom to ensure the stolen information's destruction, criminals have no incentive to destroy such valuable information that may be monetized in the future, either through extracting additional ransom payments, or using the data to commit fraud and identity theft. As cybersecurity professional Brian Krebs has noted:

> Companies hit by ransomware often face a dual threat: Even if they avoid paying the ransom and can restore things from scratch, about half the time the attackers also threaten to release sensitive stolen data unless the victim pays for a promise to have the data deleted. Leaving aside the notion that victims might have any real expectation the attackers will actually destroy the stolen data, new research suggests a fair number of victims who do pay up may see some or all of the stolen data published anyway.[20]

31. Indeed, DISA cannot reasonably maintain that the stolen information has been destroyed and will not be further disseminated. Defendant's own notice to impacted individuals contains an insert labeled, "Steps You Can Take to Help Protect Your Information," which advises them to remain vigilant for incidents of fraud and identity theft, take further actions such as monitoring their own credit records, and notify their banks or financial institutions involved and law enforcement authorities of any suspicious activity. Recognizing the risk Plaintiff and Class Members continue to face, DISA further provided them with twelve months of credit monitoring

---

[19] Toulas, *supra* n. 16.
[20] Brian Krebs, *Why Paying to Delete Stolen Data is Bonkers*, Krebs on Security (Nov. 20, 2020), https://krebsonsecurity.com/2020/11/why-paying-to-delete-stolen-data-is-bonkers/.

and identity restoration services through Experian as long as the Class Member enrolls by June 30, 2025.[21]

32. Private assessments of the Data Breach indicate that DISA failed to implement basic steps to safeguard the PII that it was entrusted.

33. Despite learning of the Data Breach on April 22, 2024, DISA did not send any notice of the Data Breach to consumers until February 21, 2025, ten months after the Data Breach occurred.[22]

34. Upon information and belief, the Data Breach occurred as a direct and proximate result of DISA's intentional, willful, reckless, and/or negligent failure to implement and follow basic security procedures in order to protect its customers' former, current, and prospective employees' PII. Indeed, had DISA properly maintained and monitored its computer systems that stored the PII, Defendant would have discovered the Data Breach sooner rather than allowing the cybercriminals unimpeded access to access and exfiltrate Plaintiff's and Class Members' PII.

35. In any event, the scope of the Data Breach shows the severity of DISA's data security failings. The cybercriminals were able to gain access to DISA's computer systems, go undetected in said computer systems, and eventually acquire the access needed to identify the location of databases containing its customers' former, current, and prospective employees' valuable PII and exfiltrate that PII. If DISA had even minimal data security measures in place, it would have been able to detect the Data Breach at a point before cybercriminals were able to successfully exfiltrate the data of more than 3 million accounts.

---

[21] *Notice of Data Breach*, *supra* n. 3.

[22] *Data Breach Notifications*, Office of the Maine Attorney General, https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/b823b27d-5fe2-4f09-8753-b362741d7f95.html (last visited March 5, 2025).

**C. The Value of Private Information and Effects of Unauthorized Disclosure.**

36. DISA was well aware that the protected PII which it acquires is highly sensitive and of significant value to those who would use it for wrongful, nefarious purposes.

37. DISA also knew that a breach of its computer systems, and exposure of the PII therein, would result in the increased risk of identity theft and fraud against the individuals whose PII was compromised.

38. These risks are not theoretical, numerous high-profile breaches have occurred at third party services companies such as Blackbaud, Fortra, Snowflake, Progress Software, Change Healthcare, and Accellion, amongst others, in recent years. These breaches put Defendant on notice that its electronic records would be targeted by cybercriminals.

39. PII is a valuable commodity to identity thieves. As the Federal Trade Commission ("FTC") recognizes, identity thieves can use this information to commit an array of crimes including identity theft, and medical and financial fraud.[23] Indeed, a robust "cyber black market" exists in which criminals openly post stolen PII and other protected financial information on multiple underground Internet websites, commonly referred to as the "dark web."

40. Criminals often trade stolen PII on the "cyber black market" for years following a breach. Cybercriminals can also post stolen PII on the internet, thereby making such information publicly available. The prevalence of data breaches and identity theft has increased dramatically in recent years, accompanied by a parallel and growing economic drain on individuals, businesses, and government entities in the United States. In 2023, there were 6,077 recorded data breach

---

[23] *What To Know About Identity Theft*, FED. TRADE COMM'N CONSUMER ADVICE (Apr. 2021), https://www.consumer.ftc.gov/articles/0271-warning-signs-identity-theft (last visited March 5, 2025).

incidents, exposing seventeen billion records. The United States specifically saw a 19.8% year-over-year increase in data breaches as compared to 2022.[24]

41. In tandem with the increase in data breaches, the rate of identity theft complaints has also increased over the past few years. For instance, in 2017, 2.9 million people reported some form of identity fraud compared to 5.7 million people in 2021.[25]

42. The breadth of data compromised in the Data Breach makes the information particularly valuable to thieves and leaves Plaintiff and Class Members especially vulnerable to identity theft, tax fraud, credit and bank fraud, and more.

43. **Social Security Numbers**—Unlike credit or debit card numbers in a payment card data breach—which can quickly be frozen and reissued in the aftermath of a breach—unique social security numbers cannot be easily replaced. Even when such numbers are replaced, the process of doing so results in a major inconvenience to the subject person, requiring a wholesale review of the person's relationships with government agencies and any number of private companies in order to update the person's accounts with those entities.

44. The Social Security Administration even warns that the process of replacing a Social Security number is a difficult one that creates other types of problems, and that it will not be a panacea for the affected person:

> Keep in mind that a new number probably will not solve all your problems. This is because other governmental agencies (such as the IRS and state motor vehicle agencies) and private businesses (such as banks and credit reporting companies) likely will have records under your old number. Along with other personal information, credit reporting companies use the number to identify your credit

---

[24] *2024 Global Threat Intelligence Report*, Flashpoint (Feb. 29, 2024), https://go.flashpoint.io/2024-global-threat-intelligence-report-download.

[25] *Insurance Information Institute, Facts + Statistics: Identity theft and cybercrime*, INSURANCE INFORMATION INSTITUTE, https://www.iii.org/fact-statistic/facts-statistics-identity-theft-and-cybercrime#Identity%20Theft%20And%20Fraud%20Reports,%202015-2019%20 (last visited March 3, 2024).

> record. So using a new number will not guarantee you a fresh start. This is especially true if your other personal information, such as your name and address, remains the same.
>
> If you receive a new Social Security Number, you should not be able to use the old number anymore.
>
> For some victims of identity theft, a new number actually creates new problems. If the old credit information is not associated with your new number, the absence of any credit history under the new number may make more difficult for you to get credit.[26]

45. Social Security Numbers allow individuals to apply for credit cards, student loans, mortgages, and other lines of credit—among other services. Often social security numbers can be used to obtain medical goods or services, including prescriptions. They are also used to apply for a host of government benefits. Access to such a wide range of assets makes social security numbers a prime target for cybercriminals and a particularly attractive form of PII to steal and then sell.

46. The ramifications of DISA's failure to keep Plaintiff's and Class Members' PII secure are long-lasting and severe. Once PII is stolen, fraudulent use of that information and damage to victims may continue for years.

47. A data breach increases the risk of becoming a victim of identity theft. Victims of identity theft can suffer from both direct and indirect financial losses. According to a research study published by the Department of Justice:

> A direct financial loss is the monetary amount the offender obtained from misusing the victim's account or personal information, including the estimated value of goods, services, or cash obtained. It includes both out-of-pocket loss and any losses that were reimbursed to the victim. An indirect loss includes any other monetary cost caused by the identity theft, such as legal fees, bounced checks, and other miscellaneous expenses that are not reimbursed (e.g., postage, phone calls, or

[26] *Identify Theft and Your Social Security Numbers*, Social Security Admin. (June 2021), https://www.ssa.gov/pubs/EN-05-10064.pdf.

notary fees). All indirect losses are included in the calculation of out-of-pocket loss.[27]

48. Even if stolen, PII does not include financial or payment card account information, that does not mean there has been no harm, or that the breach does not cause a substantial risk of identity theft. Indeed, even where cybercriminals do not gain access to a complete set of an individual's PII during a data breach, cybercriminals can cross-reference two or more sources of PII to marry data available elsewhere with criminally stolen data, resulting in complete and accurate dossiers on individuals. These dossiers are known as "Fullz" packages.

49. The development of Fullz packages means stolen PII from a data breach can easily be linked to victims' phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information (such as emails, phone numbers, or credit card numbers) is not included in the PII stolen in a specific incident, criminals can easily create a Fullz package that links that information together and sell the package at a higher price.

50. Importantly, once a cybercriminal has a Fullz package, they can use it to commit a host of criminal acts including: credit card fraud, loan fraud, identity fraud, account take overs, medical identity fraud, tax refund fraud, and buy now pay later frauds.[28] Most problematic, however, is that cybercriminals in possession of a Fullz package "are difficult to stop with ordinary online security and ID verification measures because they possess all the information needed to get past typical authentication measures."[29]

[27] Erika Harrell, *Bureau of Just. Stat.*, U.S. DEP'T OF JUST., NCJ 256085, *Victims of Identity Theft*, 2018 I (2020) https://bjs.ojp.gov/content/pub/pdf/vit18.pdf.
[28] Paige Tester, *What Are Fullz? How Hackers and Fraudsters Obtain and Use Fullz*, DATADOME (Mar. 3, 2024), https://datadome.co/guides/account-takeover/what-are-fullz-how-do-fullz-work/.
[29] *Protection Against Fullz and Fraud*, INTEGRITY (Apr. 18, 2022), https://integrity.aristotle.com/2022/04/protection-against-fullz-and-fraud/.

51. A poll of security executives predicted an increase in attacks over the next two years from "social engineering and ransomware" as nation-states and cybercriminals grow more sophisticated. Unfortunately, these preventable causes will largely come from "misconfigurations, human error, poor maintenance, and unknown assets."[30]

52. Due to high-profile data breaches at other companies and its previous data breaches, Defendant knew or should have known that its computer systems would be targeted by cybercriminals.

53. Defendant also knew or should have known the importance of safeguarding the PII with which it was entrusted and of the foreseeable consequences if its data security systems were breached. DISA failed, however, to take adequate cybersecurity measures to prevent the Data Breach and the exfiltration of its customers' former, current, and prospective employees' PII from occurring.

**D. DISA Failed to Comply with FTC Guidelines and Industry Best Practices.**

54. DISA is prohibited by the Federal Trade Commission Act, 15 U.S.C. § 45 ("FTC Act") from engaging in "unfair or deceptive acts or practices in or affecting commerce." The FTC has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of the FTC Act.

[30] Chuck Brooks, *Alarming Cyber Statistics For Mid-Year 2022 That You Need to Know*, FORBES (June 3, 2022), https://www.forbes.com/sites/chuckbrooks/2022/06/03/alarming-cyber-statistics-for-mid-year-2022-that-you-need-to-know/?sh=176bb6887864.

55. The FTC has promulgated numerous guides for businesses that highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.[31]

56. The FTC recommends that businesses:[32]

a. Identify all connections to the computers where sensitive information is stored;

b. Assess the vulnerability of each connection to commonly known or reasonably foreseeable attacks;

c. Do not store sensitive consumer data on any computer with an internet connection unless it is essential for conducting their business;

d. Scan computers on their network to identify and profile the operating system and open network services. If services are not needed, they should be disabled to prevent hacks or other potential security problems. For example, if email service or an internet connection is not necessary on a certain computer, a business should consider closing the ports to those services on that computer to prevent unauthorized access to that machine;

e. Pay particular attention to the security of their web applications—the software used to give information to visitors to their websites and to retrieve

---

[31] *Start with Security: A Guide for Business*, U.S. Federal Trade Comm'n (2015), https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf (last visited March 5, 2025).

[32] *Protecting Personal Information: A Guide for Business*, U.S. Federal Trade Comm'n (2016), https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last visited March 5, 2025).

information from them. Web applications may be particularly vulnerable to a variety of hack attacks;

f. Use a firewall to protect their computers from hacker attacks while it is connected to a network, especially the internet;

g. Determine whether a border firewall should be installed where the business's network connects to the internet. A border firewall separates the network from the internet and may prevent an attacker from gaining access to a computer on the network where sensitive information is stored. Set access controls—settings that determine which devices and traffic get through the firewall—to allow only trusted devices with a legitimate business need to access the network. Since the protection a firewall provides is only as effective as its access controls, they should be reviewed periodically;

h. Monitor incoming traffic for signs that someone is trying to hack in. Keep an eye out for activity from new users, multiple log-in attempts from unknown users or computers, and higher-than-average traffic at unusual times of the day; and

i. Monitor outgoing traffic for signs of a data breach. Watch for unexpectedly large amounts of data being transmitted from their system to an unknown user. If large amounts of information are being transmitted from a business's network, the transmission should be investigated to make sure it is authorized.

57. The FTC further recommends business take additional cybersecurity steps, which include:[33]

a. Conducting an inventory of all company devices that store sensitive data, and understanding what types of PII is stored on those devices;

b. Encrypting sensitive personal information stored on computer networks so that it is unreadable even if hackers are able to gain access to the information;

c. Crafting a data security plan that involves both physical security (*e.g.*, locking up physical files) and electronic security, and training employees regarding the data security plan.

d. Promptly disposing of PII that is no longer needed, and retaining sensitive data only as long as companies maintain a legitimate business need for the information; and

e. Developing a plan to handle a data breach or data security incident, if and when such an incident occurs.

58. The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the FTC Act. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

59. Upon information and belief, DISA failed to properly implement one or more of the basic data security practices described above. Defendant's failure to employ reasonable and

[33] *Id.*

appropriate measures to protect against unauthorized access to PII resulted in the unauthorized access to and exfiltration of Plaintiff's and Class Members' PII.

60. DISA's failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data constitutes an unfair act of practice prohibited by Section 5 of the FTC Act.

61. Similarly, the U.S. Government's National Institute of Standards and Technology ("NIST") provides a comprehensive cybersecurity framework that companies of any size can use to evaluate and improve their information security controls.[34]

62. NIST publications include substantive recommendations and procedural guidance pertaining to a broad set of cybersecurity topics including risk assessments, risk management strategies, access controls, training, data security controls, network monitoring, breach detection, and incident response.[35] Upon information and belief, DISA failed to adhere to the NIST guidance.

63. Upon information and belief, Defendant's failure to protect Plaintiff's and Class Members' PII is a result of DISA's failure to adopt reasonable safeguards as required by the FTC, NIST, and industry best practices.

64. DISA was, at all times, fully aware of its obligations to protect the PII of its customers' former, current, and prospective employees because of its business model of collecting PII to provide its investment services. DISA was also aware of the significant repercussions that would result from its failure to do so.

---

[34] *See Framework for Improving Critical Infrastructure Cybersecurity*, NATIONAL INSTITUTE OF STANDARDS AND TECHNOLOGY (April 16, 2018), Appendix A, Table 2, https://nvlpubs.nist.gov/nistpubs/cswp/nist.cswp.04162018.pdf.
[35] *Id.* at Table 2 pg. 26-43.

**E. Plaintiff and Class Members Suffered Damages.**

65. The ramifications of DISA's failure to keep its customers' former, current, and prospective employees' PII secure are long-lasting and severe. Defendant's conduct, which allowed the Data Breach to occur, caused Plaintiff and Class Members significant injuries and harm in several ways, including theft of their PII as well as substantial and imminent risk of identity theft and fraud. Plaintiff and Class Members must immediately devote time, energy, and money to: (1) closely monitor their bills, records, and credit and financial accounts; (2) change login and password information on any sensitive account even more frequently than they already do; (3) more carefully screen and scrutinize phone calls, emails, and other communications to ensure that they are not being targeted in a social engineering, spear phishing, or extortion attacks; and (4) search for suitable identity theft protection and credit monitoring services, and pay to procure them.

66. In 2019, the United States Government Accountability Office ("GAO") released a report addressing the steps consumers can take after a data breach.[36] Its appendix of steps consumers should consider, in extremely simplified terms, continues for five pages. In addition to explaining specific options and how they can help, one column of the chart explains the limitations of the consumers' options. It is clear from the GAO's recommendations that the steps data breach victims (like Plaintiff and Class Members) must take after a data breach, like Defendant's, are both time-consuming and of only limited and short-term effectiveness.

67. The FTC, like the GAO, recommends that identity theft victims take several steps to protect their personal and financial information after a data breach, including contacting one of

[36] Government Accountability Off., *Data Breaches* (Mar. 2019) https://www.gao.gov/assets/gao-19-230.pdf.

the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for seven years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[37]

68. Further, once PII is exposed, there is virtually no way to ensure that the exposed information has been fully recovered or obtained against future misuse.

69. It must also be noted there may be a substantial time lag—measured in years—between when harm occurs versus when it is discovered, and also between when PIIs stolen and when it is used. According to the GAO, which has conducted studies regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[38]

70. For these reasons, Plaintiff and Class Members will need to maintain these heightened measures for years, and possibly their entire lives as a result of Defendant's conduct.

71. The value of Plaintiff's and Class Members' PII has been diminished by its exposure in the Data Breach. Indeed, PII is a valuable commodity to identity thieves, and, once it has been compromised, criminals will use them and trade the information on the cyber black market for years thereafter.[39]

---

[37] *See Identity Theft Victim Checklist*, Fed. Trade Comm'n, https://www.identitytheft.gov/Steps (last visited March 5, 2025).
[38] *See* 2007 GAO Report, at 29.
[39] *The Price Cybercriminals Charge for Stolen Data*, Trustwave (Aug. 6, 2023), https://www.trustwave.com/en-us/resources/blogs/spiderlabs-blog/the-price-cybercriminals-charge-for-stolen-data/.

72. The reality is that cybercriminals seek nefarious outcomes from a data breach, and stolen PII can be used to carry out a variety of crimes.

73. Plaintiff and Class Members are also at a continued risk because their information remains in Defendant's systems, which have already been shown to be susceptible to compromise and attack and is subject to further attack so long as Defendant fails to undertake the necessary and appropriate security and training measures to protect its customers' former, current, and prospective employees' PII.

74. As a result of DISA's failures, Plaintiff and Class Members face an increased risk of identity theft and fraud, phishing attacks, and related cybercrimes because of the Data Breach. Those impacted are under heightened and prolonged anxiety and fear, as they will be at risk of falling victim to cybercrimes for years to come.

75. Plaintiff and Class Members have suffered emotional distress as a result of the Data Breach, the increased risk of identity theft and financial fraud, and the unauthorized exposure of their private information to strangers and cybercriminals.

**F. Plaintiff's Experience.**

76. Plaintiff is an employee or former employee of one of Defendant's customers. In order to utilize Defendant's TPA services, Plaintiff's employer or former employer was required to entrust DISA with her PII as part of an employee screening process. In collecting and maintaining the PII of Plaintiff, Defendant undertook a duty to act reasonably in its handling of her PII. DISA, however, did not take reasonable care of her PII, leading to its exposure and compromise as a direct result of Defendant's inadequate data security measures.

77. Plaintiff received a Notice of Data Incident letter, dated February 21, 2025, from Defendant stating that her PII might have been involved in the Data Breach.

78. Since the announcement of the Data Breach, Plaintiff has been required to spend her valuable time and effort taking steps to mitigate the risk of misuse of her PII. Plaintiff would not have had to engage in these time intensive efforts but for the Data Breach.

79. Plaintiff has suffered actual injury from having her PII exposed and/or stolen as a result of the Data Breach, including: (a) mitigation efforts to prevent the misuse of her PII; (b) damages to and diminution of the value of her PII, a form of intangible property that loses value when it falls into the hands of criminals who are using that information for fraud or publishing the information for sale on the dark web; and (c) loss of privacy.

80. Given the nature of the information compromised in the Data Breach and the propensity of criminals to use such information to commit a wide variety of crimes, Plaintiff faces a significant, present, and ongoing risk of identity theft and fraud, and other identity-related fraud now and into the indefinite future.

81. In addition, knowing that hackers accessed and likely exfiltrated her PII and that this information likely has been and will be used in the future for identity theft, fraud, and other nefarious purposes has caused Plaintiff to experience significant frustration, anxiety, worry, stress, and fear.

## V. <u>CLASS ACTION ALLEGATIONS</u>

82. Plaintiff brings this case individually and, pursuant to Rule 23 of the Federal Rules of Civil Procedure, on behalf of the class defined as:

> All individuals in the United States whose PII was compromised in the DISA Data Breach which was announced on or about February 21, 2025 (the "Class").

83. Excluded from the Class are Defendant, its subsidiaries and affiliates, its officers, directors, and members of its officers' and directors' immediate families, any entity in which

Defendant has a controlling interest, the legal representative, heirs, successors, or assigns of any such excluded party, the judicial officer(s) to whom this action is assigned, and the members of those judicial officers' immediate families.

84. Plaintiff reserves the right to modify or amend the definition of the proposed Class prior to moving for class certification.

85. **Numerosity.** The class described above is so numerous that joinder of all individual members in one action would be impracticable. The disposition of the individual claims of the respective Class Members through this class action will benefit both the parties and this Court. The exact size of the Class and the identities of the individual members thereof are ascertainable through Defendant's records, including, but not limited to, the files implicated in the Data Breach. Upon information and belief, the Class, at minimum, comprises millions of individuals.[40]

86. **Commonality.** This action involves questions of law and fact that are common to Plaintiff and the Class Members. Such common questions include, but are not limited to:

- Whether and to what extend Defendant had a duty to protect the PII of Plaintiff and Class Members;
- Whether Defendant was negligent in collecting and storing Plaintiff's and Class Members' PII;
- Whether Defendant had duties not to disclose the PII of Plaintiff and Class Members to unauthorized third parties;
- Whether Defendant took reasonable steps and measures to safeguard Plaintiff's and Class Members' PII;

[40] Toulas, *supra* n. 16.

- Whether Defendant failed to adequately safeguard the PII of Plaintiff and Class Members;
- Whether Defendant breached its duties to exercise reasonable care in handling Plaintiff's and Class Members' PII;
- Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;
- Whether Plaintiff and Class Members are entitled to damages as a result of Defendant's wrongful conduct; and
- Whether Plaintiff and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Data Breach.

87. **Typicality.** Plaintiff' claims are typical of the claims of the Class Members. The claims of Plaintiff and Class Members are based on the same legal theories and arise from the same failure by Defendant to safeguard their PII. Plaintiff and Class Members entrusted Defendant with their PII, and it was subsequently accessed by an unauthorized third party.

88. **Adequacy of Representation.** Plaintiff is an adequate representative of the Class because her interests do not conflict with the interests of the other Class Members Plaintiff seeks to represent; Plaintiff has retained counsel competent and experienced in complex class action litigation; Plaintiff intends to prosecute this action vigorously; and Plaintiff's counsel has adequate financial means to vigorously pursue this action and ensure the interests of the Class will not be harmed. Furthermore, the interests of the Class Members will be fairly and adequately protected and represented by Plaintiff and Plaintiff's counsel.

89. **Superiority.** This class action is appropriate for certification because class proceedings are superior to other available methods for the fair and efficient adjudication of this controversy and joinder of all members of the Class is impracticable. This proposed class action presents fewer management difficulties than individual litigation, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court. Class treatment will create economies of time, effort, and expense and promote uniform decision-making.

90. **Predominance.** Common questions of law and fact predominate over any questions affecting only individual Class members. Similar or identical violations, business practices, and injuries are involved. Individual questions, if any, pale by comparison, in both quality and quantity, to the numerous common questions that dominate this action. For example, Defendant's liability and the fact of damages is common to Plaintiff and each member of the Class. If Defendant breached its duties and released Plaintiff's and Class Members' PII, then Plaintiff and each Class member suffered damages by that conduct.

91. **Ascertainability:** Members of the Class are ascertainable. Class Membership is defined using objective criteria, and Class Members may be readily identified through Defendant's books and records.

## VI. CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### NEGLIGENCE
### (On Behalf of Plaintiff and the Class)

92. Plaintiff restates and realleges the allegations contained in paragraphs 1 through 91 as if fully set forth herein.

93. Defendant owed a duty under common law to Plaintiff and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting their PII in Defendant's possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons.

94. Specifically, this duty included, among other things: (a) designing, maintaining, and testing Defendant's security systems to ensure that Plaintiff's and Class Members' PII in Defendant's possession was adequately secured and protected; (b) implementing processes that would detect a breach of its security system in a timely manner; (c) timely acting upon warnings and alerts, including those generated by its own security systems, regarding intrusions to its networks; and (d) maintaining data security measures consistent with industry standards.

95. DISA's duty to use reasonable care arose from several sources, including but not limited to those described below.

96. Defendant had a common law duty to prevent foreseeable harm to others. This duty existed because Plaintiff and Class Members were the foreseeable and probable victims of any inadequate security practices on the part of Defendant. By collecting and storing valuable PII that is routinely targeted by criminals for unauthorized access, DISA was obligated to act with reasonable care to protect against these foreseeable threats.

97. Defendant also owed a common law duty because its conduct created a foreseeable risk of harm to Plaintiff and Class Members. DISA's conduct included its failure to adequately restrict access to its computer networks and/or servers that held individuals' PII.

98. Defendant also knew or should have known of the inherent risk in collecting and storing massive amounts of PII, the importance of implementing adequate data security measures

to protect that PII, and the frequency of cyberattacks such as the Data Breach in the financial sector.

99. Defendant breached the duties owed to Plaintiff and Class Members and thus was negligent. DISA breached these duties by, among other things: (a) mismanaging its system and failing to identify reasonably foreseeable internal and external risks to the security, confidentiality, and integrity of customer information that resulted in the unauthorized access and compromise of PII; (b) mishandling its data security by failing to assess the sufficiency of its safeguards in place to control these risks; (c) failing to design and implement information safeguards to control these risks; (d) failing to adequately test and monitor the effectiveness of the safeguards' key controls, systems, and procedures; (e) failing to evaluate and adjust its information security program in light of the circumstances alleged herein; (f) failing to detect the breach at the time it began or within a reasonable time thereafter; (g) failing to follow its own privacy policies provided to customers; and (h) failing to adequately train and supervise employees and third party vendors with access or credentials to systems and databases containing sensitive PII.

100. But for DISA's wrongful and negligent breach of its duties owed to Plaintiff and Class Members, their PII would not have been access, exfiltrated, and compromised by cybercriminals.

101. As a direct and proximate result of Defendant's negligence, Plaintiff and Class Members have suffered injuries including:

a. Theft of their PII;

b. Costs associated with requesting credit freezes;

c. Costs associated with the detection and prevention of identity theft;

d. Costs associated with purchasing credit monitoring and identity theft protection services;

e. Lowered credit scores resulting from credit inquiries following fraudulent activities;

f. Costs associated with time spent and the loss of productivity from taking time to address and attempt to ameliorate, mitigate, and deal with the actual and future consequences of the Data Breach;

g. The imminent and certainly impending injury flowing from potential fraud and identity theft posed by their PII being placed in the hands of criminals;

h. Damages to and diminution in value of their PII entrusted to DISA with the mutual understanding that Defendant would safeguard Plaintiff' and Class Members' data against theft and not allow access and misuse of their data by others; and

i. Continued risk of exposure to hackers and thieves of their PII, which remains in Defendant's possession and is subject to further breaches so long as Defendant fails to undertake appropriate and adequate measures to protect Plaintiff and Class Members.

102. As a direct and proximate result of DISA's negligence, including its gross negligence, Plaintiff and Class Members are entitled to damages, including compensatory, punitive, and/or nominal damages, in an amount to be proven at trial.

**SECOND CAUSE OF ACTION**
**NEGLIGENCE PER SE**
**(On Behalf of Plaintiff and the Class)**

103. Plaintiff restates and realleges the allegations contained in paragraphs 1 through 91 as if fully set forth herein.

104. Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce" including, as interpreted and enforced by the FTC, the unfair act or practice by companies such as DISA for failing to use reasonable measures to protect PII. Various FTC publications and orders also form the basis of Defendant's duties.

105. Defendant violated Section 5 of the FTC Act by failing to use reasonable measures to protect customers' former, current, and prospective employees' PII and not complying with the industry standards. DISA's conduct was particularly unreasonable given the nature and amount of PII it obtained and stored and the foreseeable consequences of a data breach.

106. Plaintiff and Class Members are consumers within the class of persons Section 5 of the FTC Act was intended to protect.

107. Moreover, the harm that has occurred is the type of harm that the FTC Act was intended to guard against. Indeed, the FTC has pursued over fifty enforcement actions against businesses which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm suffered by Plaintiff and Class Members.

108. DISA's violation of Section 5 of the FTC Act constitutes negligence *per se*.

109. As a direct and proximate result of Defendant's negligence, Plaintiff and Class Members have suffered injuries, including those identified in paragraph 101 above.

110. As a direct and proximate result of DISA's negligence, Plaintiff and Class Members have been injured as described herein and above, and are entitled to damages, including compensatory, punitive, and/or nominal damages, in an amount to be proven at trial.

**THIRD CAUSE OF ACTION**
**UNJUST ENRICHMENT**
**(On Behalf of Plaintiff and the Class)**

111. Plaintiff restates and realleges the allegations contained in paragraphs 1 through 91 as if fully set forth herein.

112. Plaintiff and Class Members conferred a monetary benefit on DISA by providing them with their valuable PII.

113. DISA knew that Plaintiff and Class Members conferred a benefit upon them and accepted and retained that benefit by accepting and retaining the PII entrusted to it. Defendant profited from Plaintiff's and Class Members' PII and use of Plaintiff's and Class Members' PII for business purposes.

114. Defendant failed to secure Plaintiff's and Class Members' PII and, therefore, did not fully compensate Plaintiff or Class Members for the value that their PII provided.

115. DISA acquired the PII through inequitable record retention as it failed to disclose the inadequate data security practices previously alleged.

116. If Plaintiff and Class Members had known Defendant would not use adequate data security practices, procedures, and protocols to adequately monitor, supervise, and secure their PII, they would not have agreed to the entrustment of their PII to Defendant.

117. Under the circumstances, it would be unjust for DISA to be permitted to retain any of the benefits that Plaintiff and Class Members conferred upon it.

118. Plaintiff and Class Members are without an adequate remedy at law.

119. As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have suffered injuries, including those identified in paragraph 101 above.

120. Plaintiff and Class Members are entitled to restitution and/or damages from DISA and/or an order proportionally disgorging all profits, benefits, and other compensation obtained by Defendant from its wrongful conduct, as well as return of their sensitive PII and/or confirmation that it is secure. This can be accomplished by establishing a constructive trust from which the Plaintiff and Class Members may seek restitution or compensation.

**FOURTH CAUSE OF ACTION**
**DECLARATORY JUDGMENT**
**(On Behalf of Plaintiff and the Class)**

121. Plaintiff restates and realleges the allegations contained in paragraphs 1 through 91 as if fully set forth herein.

122. Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq*., this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and to grant further necessary relief. Furthermore, the Court has broad authority to restrain acts that are tortious and violate the terms of the federal laws and regulations described herein.

123. An actual controversy has arisen in the wake of the Data Breach regarding Plaintiff's and Class Members' PII and whether DISA is currently maintaining data security measures adequate to protect Plaintiff and Class Members from further data breaches that compromise their PII. Plaintiff alleges that Defendant still possess Plaintiff's and Class Members' PII, and that Defendant's data security measures remain inadequate. Furthermore, Plaintiff and Class Members continue to suffer injury as a result of the compromise of their PII and remain at imminent risk that further compromises of their PII will occur in the future.

124. Pursuant to its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

a. Defendant owes a legal duty to secure consumers' PII under the common law and Section 5 of the FTC Act; and

b. Defendant continues to breach this legal duty by failing to employ reasonable data security measures to safeguard Plaintiff's and Class Members' PII.

125. This Court also should issue corresponding prospective injunctive relief requiring Defendant to employ adequate security protocols consistent with law and industry standards to protect consumers' PII in their possession.

126. If an injunction is not issued, Plaintiff and Class Members will suffer irreparable injury, and lack an adequate legal remedy, in the event of another data breach at DISA. The risk of another such breach is real, immediate, and substantial. If another breach at DISA occurs, Plaintiff and Class Members will not have an adequate remedy at law because many of the resulting injuries are not readily quantified, and they will be forced to bring multiple lawsuits to rectify the same conduct.

127. The hardship to Plaintiff and Class Members if an injunction is not issued exceeds the hardship to Defendant if an injunction is issued. Plaintiff and Class Members will likely be subjected to substantial identity theft and other damage. On the other hand, the cost to Defendant of complying with an injunction by employing reasonable prospective data security measures is relatively minimal, and Defendant has a pre-existing legal obligation to employ such measures.

128. Issuance of the requested injunction will not disserve the public interest. On the contrary, such an injunction would benefit the public by preventing another data breach at

Defendant, thus eliminating the additional injuries that would result to Plaintiff and consumers whose confidential information would be further compromised.

## VII. PRAYER FOR RELIEF

WHEREFORE Plaintiff, on behalf of all others similarly situated, prays for relief as follows:

A. For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiff as representatives of the Class and Plaintiff's attorneys as Class Counsel to represent the Class;

B. For an order finding in favor of Plaintiff and the Class on all counts asserted herein;

C. For damages in an amount to be determined by the trier of fact;

D. For an order of restitution and all other forms of equitable monetary relief;

E. Declaratory and injunctive relief as described herein;

F. Awarding Plaintiff' reasonable attorneys' fees, costs, and expenses;

G. Awarding pre- and post-judgment interest on any amounts awarded; and

H. Awarding such other and further relief as may be just and proper.

## VIII. JURY TRIAL DEMANDED

A jury trial is demanded on all claims so triable.

Dated: March 5, 2025

Respectfully submitted,

*/s/ Emil Lippe, Jr.*
Emil Lippe, Jr.
Texas State Bar No.12398300
Southern Dist.ID No.4230
LAW OFFICES OF LIPPE & ASSOCIATES
Park Place at Turtle Creek
2911 Turtle Creek Blvd., Suite 1250
Dallas, Texas 75219-6212

(214)855-1850
emil@texaslaw.com

Gary F. Lynch*
Pa.State Bar No.56887
gary@lcllp.com
Gerald D. Wells, III*
Pa.State Bar No. 88277
jerry@lcllp.com
**LYNCH CARPENTER, LLP**
1133 Penn Ave., 5th Floor
Pittsburgh, PA 15222
Telephone: (267) 344-0990
Facsimile: (412) 231-0246

*Attorneys for Plaintiff and the Proposed Class*
**Pro hac vice* application forthcoming